DECISION
Defendant-appellant, Michael J. McCoy, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to a jury verdict finding appellant guilty of three counts of felonious assault.
The charges against appellant arose from an incident between neighbors on Frank Road in Franklin County, Ohio, on the night of September 12, 1998. Appellant's brother Brian McCoy and his father Joe McCoy were also charged. The state alleged that appellant, his brother, and his father assaulted newlyweds John and Carolyn Lodahl, and the couple's friend, Greg Aliff, with baseball bats and pipes. The three defendants were tried together.
The first prosecution witness at trial was one of the victims, John Lodahl. John testified that he and his new wife Carolyn had been married on the day in question and had afterwards attended their wedding reception. They returned home after the reception, accompanied by the third victim of the assault, Greg Aliff, in late afternoon or early evening. Aliff was a high school friend and as a professional caterer had provided the banquet service for the wedding reception. Accompanying the trio were Carolyn's son Jeremy and her younger sister, Amber Dolby.
After returning to the home, the group unloaded from their car some excess food items which had been brought from the reception, and entertained various small groups of friends who stopped by to wish them well before their honeymoon. Most of these well-wishers did not stay long, and the total number of people in the home at any given time was not large. John testified that the reception itself had been dry, and afterwards neither he nor Carolyn had consumed any alcohol, although some of their visitors did bring beer and had one or two drinks at the home.
John testified that as he and Carolyn were planning to leave later that evening for Cincinnati on their honeymoon, a verbal exchange occurred around 9:00 p.m. between John and an unidentified person standing in front of the nearby McCoy residence. The unknown individual yelled for Amber Dolby, Carolyn's sister, to come over to the McCoys. Amber indicated to John that she did not wish to speak to the person, and John then shouted over to the McCoys that Amber did not wish to have anything to do with them. At that point, the unknown individual became angry, began yelling, and eventually threw a forty ounce beer bottle into the Lodahl's yard. Thereafter, appellant ran out of the McCoy's house and jumped the fence, waving a baseball bat at John. Appellant then threatened to burn down the Lodahl's house. John testified that, to avoid the confrontation, he walked back towards his front porch. Appellant took one or two swings at John without hitting him. Meanwhile, other persons in the McCoy's front yard had begun throwing more trash and pieces of lawn furniture over the fence into the Lodahl's front yard.
At that point, one of the neighbors called the police who arrived shortly thereafter. The police took statements from persons on both sides of the dispute. In the interval, appellant's father, Joe and brother Brian, arrived at the McCoy residence in a car and also began yelling and acting hostile towards the Lodahls. Joe McCoy's girlfriend, Betty Siders, stated to the police that Lodahl had come over to her property and punched her in the face, provoking the dispute. The police were ultimately able to calm the parties during this first confrontation and eventually departed.
John further testified that, after this first incident, he and his new wife continued to prepare to depart on their honeymoon. At approximately 11:00 p.m., they were in the car preparing to leave as Amber, Jeremy, and Greg watched. Carolyn was in the driver's seat and John was seated in the passenger seat. As they were about to leave, John asked Aliff for a cigarette lighter to take with them. Aliff walked out to the vehicle, bent over to hand John the lighter, when suddenly appellant appeared running across the yard carrying a wooden baseball bat, leaped over the top of the car, and clubbed Aliff in the head. John observed Aliff recoil from the blow and then saw appellant's brother moving around the back of the vehicle, also carrying a baseball bat, and also hitting Aliff. John shouted for everyone to get back inside the house immediately and began to get out of the vehicle. Carolyn remained seated in the vehicle because she already had her seat belt on and was attempting to free herself as John ran for the house. After John had moved only a few steps, Joe McCoy appeared and struck him with a metal pipe, knocking him to the ground. All three defendants then began beating Lodahl as he fell, first to his knees, then to his face. John testified that another individual, a friend of the McCoys, known to him only as "Ron," also participated in the beating. John began to lose consciousness and then felt his wife Carolyn sprawled across him, shouting for the McCoys to stop and that they were going to kill him. John described himself as losing consciousness at this time.
John testified that after the beating he was taken by the emergency squad to the hospital and kept overnight. Numerous x-rays were taken and he received stitches or staples to close his head wounds. He had received several blows to the head and numerous blows to his arms, hands, and back as he attempted to fend off the assault. As John described the aftermath of the beating, the state introduced and authenticated various photographs showing the injuries he suffered. On cross-examination, John denied striking or slapping Betty, Joe McCoy's girlfriend, during the earlier confrontation.
The next witness for the prosecution was Greg Aliff. His testimony largely coincided with John as far as the events leading up to the first confrontation. Aliff was not a frequent visitor to the Lodahl's home and did not know the McCoys by sight prior to the evening in question. Aliff described how the second, violent, confrontation began. As he was handing a cigarette lighter to John who was seated in the car, Aliff felt a sharp blow to the top of his head. He attempted to gather his wits and as he turned to ascertain the situation, he saw another individual, already in mid-swing, striking him again in the head. Partially stunned, Aliff attempted to run for the porch. The second individual who had struck him followed him all the way to the porch hitting him as they ran. Aliff identified appellant as the first person to strike him and Brian McCoy as the second. When Aliff reached the porch, he faced yet another assailant, not one of the three defendants, who was described as having blond hair and a white ball cap. After Aliff succeeded in getting through the door into the house, his assailants began shattering the screen door and front picture window. The individual in the white hat soon stopped, but the person who had first struck Aliff persisted smashing various items on the front porch. Aliff identified the more persistent of his assailants as Brian McCoy.
After Brian stopped smashing windows in front of the house, Aliff heard a scream from Carolyn. Aliff looked out the front porch and saw five people beating John Lodahl as he lay motionless in the front yard. Aliff at first thought John was dead because he was not moving at all. Aliff was attempting to find a telephone to call for help but was unable to locate the Lodahl's cordless phone. He then saw Carolyn throw herself across her husband to intervene between him and the attackers. At that time, the assailants disappeared, and soon thereafter Aliff heard sirens approaching. He went out on the porch to get some air and to "avoid bleeding all over the house."
Aliff was taken to the hospital and released early the next morning. The prosecution introduced photographs showing his many injuries, including scalp lacerations and severe bruises to his forearms and back. The prosecution also introduced photographs as evidence of the condition of the house after the assault, with broken glass, extensive damage, and much of Aliff's blood spattered about the premises.
Aliff specifically identified appellant as the first person to hit him and Brian McCoy as the second person to beat him. Aliff testified that he had no recollection of being struck by Joe McCoy, and the unknown individual with the blond hair and the white ball cap who had struck him was not one of the three defendants. He identified appellant, Brian, Joe, and the unknown fourth assailant as all participating in beating John Lodahl as he lay motionless on the ground.
The next witness for the prosecution was Carolyn Lodahl. She corroborated her husband's version of events leading up to the attack. Carolyn testified that as she and her husband were preparing to leave, while Aliff leaned towards the passenger side window to hand her husband a cigarette lighter, appellant appeared "out of nowhere" and jumped over the car. There was a loud thump as the ball bat he was carrying struck the top of the car, and Carolyn thought the sunroof of the car had been broken. Carolyn heard her husband shout to run for the house. As she exited the vehicle, she saw Brian McCoy chasing Aliff with a baseball bat and swinging at him as they ran toward the house. She could not tell if Brian was actually making contact with Aliff but he was running close behind and swinging a bat. At that point, Joe McCoy appeared carrying a metal pipe and began beating John, who was lying on the ground. John was not fighting back, but was holding his arms over his head to ward off the blows. Carolyn saw both Joe McCoy and appellant hit John at least twenty times before he fell to the ground and perhaps fifteen more thereafter. Afterwards, Brian McCoy and the blond haired man with the white baseball cap joined in on the beating of John. Carolyn ran up behind Joe McCoy and pulled him away and threw herself over the top of her husband. She felt a single blow on the back of her leg and then the assailants ran away.
Carolyn further testified that after the beating, her husband appeared completely unconscious and was bleeding profusely from his scalp wounds. She began crying and screaming for help at which point she observed Betty Siders standing in the McCoy's front yard and laughing at them. Carolyn identified the fourth man who participated in the assault, the blond individual wearing a ball cap, as a friend of the McCoy's named Ron. She stated that even though at the time of the attack it was 11:00 p.m. and dark, the area where the attack occurred was generally well lit by street and porch lights.
The next witness for the prosecution was Amy McGhee, a neighbor. She testified that she knew both the Lodahls and McCoys and had a good relationship with both families but was not particularly close to either. On the night in question, she was spending the evening at home when she heard a loud argument from the Lodahl's residence. As she stepped to the porch to investigate, she saw a beer bottle hit the fence between the properties. She immediately called 911 and the police came and broke up the argument. The McCoys and Lodahls went back into their respective houses.
McGhee testified that after an interval, another scene erupted. She was outside talking to her next door neighbor, Cathy Kirk, and saw the Lodahls and Greg Aliff leaving their house. After they had reached their car, a person jumped over the car and struck Aliff in the head with a baseball bat. McGhee immediately went back into her house and called 911 again. As she was on the phone with the 911 operator, she looked out the window and saw Lodahl lying motionless on the ground being beaten by two men with baseball bats. The assailants were facing away from McGhee so she could not identify them. After finishing the phone call, she went back outside and at that time observed John Lodahl lying motionless in the grass with his wife shielding him with her body. McGhee described the lighting as generally good, and although she could not see the assailants' faces, their build and general description matched that of Brian McCoy and appellant and both assailants had come from the McCoy's house. She did not see Joe McCoy participate in the beating.
Also testifying for the prosecution was Cathy Kirk, another neighbor. On the night in question, she was sitting in her yard at a patio table and watched the Lodahls carrying things out to their car. As they got ready to leave, she saw someone jump over the top of the car carrying a bat which struck the car with a dinging noise. At that moment, Aliff ran into the house and the Lodahls attempted to do the same. Brian McCoy pursued Aliff and smashed out the light on the front porch. John fell to the ground and appellant, his brother and father began beating him with baseball bats or clubs. As Lodahl lay on the ground, Carolyn threw herself across him to protect him from the blows. At that time, the assailants left, and Joe McCoy went into his house. Kirk was unsure where appellant and his brother Brian went.
The state then rested. The court overruled a Rule 29 motion brought by counsel for appellant. Counsel for defendant, Joe McCoy, then called Betty Siders, Joe's live-in girlfriend, to testify. She generally testified that Lodahl had been the aggressor in the earlier incident between the families and had punched her in the eye and hit her dog. Persons in the Lodahls' yard threw beer bottles at her family and were armed with clubs, although no one was hit during this earlier confrontation. Thereafter, Joe was inside watching TV when some time later they heard sirens and went to the door to see someone lying in the yard next door with paramedics attending to him.
On cross-examination by counsel for appellant, Siders testified that appellant had left the residence with his aunt soon after the first confrontation with the Lodahls and their guests and had not returned.
Judith A. McCoy, sister of Joe McCoy, testified on behalf of appellant. Her testimony was that, on the night in question, appellant called her and asked to be picked up at Joe's house because there had been some trouble with the neighbors. She thereafter went over to pick up appellant, and found the police still there attending to the first confrontation between the families. Judith and appellant left around 10:00 p.m., and went over to her boyfriend's house. Appellant was with her the rest of the evening, covering the period of the alleged attack. She later returned to the McCoy home on Frank Road because she learned from a phone call that Joe had been arrested. Appellant did not accompany her on this second trip.
No further material witnesses were heard, and the matter was thereafter submitted to the jury, which after two days' deliberation returned a verdict of guilty on all three counts against appellant. The court sentenced appellant to three seven-year terms on each count, with two to be served consecutively and one concurrently.
Appellant has timely appealed and brings the following assignments of error:
 1. THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 2. THE TRIAL COURT ERRED BY IMPOSING CONSECUTIVE SENTENCES UPON THE DEFENDANT-APPELLANT.
Appellant's first assignment of error asserts that his conviction was against the manifest weight of the evidence presented at trial, and that the evidence was insufficient to sustain a conviction. The legal concepts of sufficiency of the evidence and weight of the evidence involve different determinations. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. As to sufficiency of the evidence, "`sufficiency'" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Id., citing Black's Law Dictionary (6 Ed. 1990) 1433. A determination as to whether the evidence is legally sufficient to sustain a verdict is a question of law. Thompkins, at 386. The relevant inquiry on review of the sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.Jackson v. Virginia (1979), 99 S.Ct. 2781, 2789. A reversal based on insufficient evidence has the same effect as a not guilty verdict (and thus precludes retrial) because such a determination "means that no rational factfinder could have voted to convict the defendant." Tibbs v. Florida (1982), 102 S.Ct. 2211, 2218.
As opposed to the concept of sufficiency of the evidence, the court in Thompkins stated:
 * * * Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence
sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's, supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a '"thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. * * * [Thompkins, supra, at 387. (Emphasis sic; citations omitted.)]
In Thompkins, the court cited with approval language from State v.Martin (1983), 20 Ohio App.3d 172, 175, in which that court held that, in considering a manifest weight challenge, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. a 175. In State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported, this court noted that, when called upon to consider the issue of manifest weight of the evidence, "the appellate court must engage in a limited weighing of the evidence to determine whether there is sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt."
Appellant's brief on appeal, other than setting forth the above standard, does not point out specifically how the evidence at trial was either insufficient or weighed against his conviction. Without excess reiteration of the testimony set forth above, we find that the evidence at trial was both sufficient and the verdict was not against the weight of the evidence. Multiple prosecution witnesses identified appellant as the first person to strike Greg Aliff, and as one of the assailants who struck John Lodahl. Although there was no direct evidence in the form of eyewitness testimony that appellant had personally struck Carolyn Lodahl, there was ample evidence to find him guilty of complicity in the felonious assaults upon her as well. Evidence of aiding and abetting another may be demonstrated by both direct and circumstantial evidence. Participation in a criminal offense may be inferred from presence, companionship, and conduct both before, during and after the offense is committed. State v. Cartellone
(1981), 3 Ohio App.3d 145,150, citing State v. Pruitt (1971),28 Ohio App.2d 29, 34. Furthermore, a defendant may be convicted of complicity even though he was indicted as a principal. State v.Tumbleson (1995), 105 Ohio App.3d 693. R.C. 2923.03(F) provides that an accomplice to the commission of an offense shall be prosecuted and punished as if he were the principal offender. The record in the present case demonstrates that the court properly instructed the jury that appellant could be found guilty both as a principal and as an accomplice to all three felonious assaults. Appellant struck the first blow of a concerted, violent and surprise assault upon three victims, two of whom suffered substantial injury. Appellant continued to rain blows with a baseball bat upon a prostrate and unconscious John Lodahl. On these facts, it is clearly unnecessary for the prosecution to establish that appellant personally struck each of the three victims; his participation in the general assault is sufficient to sustain a conviction of felonious assault on all three counts.
Appellant's first assignment of error is accordingly overruled.
Appellant's second assignment of error asserts that the trial court erred in sentencing him to consecutive seven-year terms on two of the convictions. R.C. 2953.08(C) allows a defendant to appeal a sentence when the trial judge imposes consecutive terms under R.C. 2929.14(E)(4), if the sentences exceed the maximum term of incarceration allowed by R.C.2929.14(A) for the most serious offense of which the appellant was convicted. R.C. 2929.19(B)(2)(c) further requires the trial court to make a finding giving its reasons for imposing consecutive sentences. R.C. 2929.14(E)(4) sets forth the grounds for imposition of consecutive multiple sentences:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offenders conduct and to the danger the offender posses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
A defendant claiming an error in sentencing will be granted appellate relief only upon a clear and convincing showing supporting reversal or modification of the sentence. R.C.2953.08(G)(1). A trial court retains broad discretion in sentencing and a reviewing court will not disturb the sentence imposed unless the trial court abused its discretion. State v.Epley (Aug. 25, 1998), Franklin App. No. 97AP-1467, unreported. The term "abuse of discretion" connotes more than a mere error of law or judgment, it implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217.
Appellant argues that in the present case, the fourteen year sentence "shocks the conscience" and is excessive in light of the fact that neither Lodahl nor Aliff sustained injuries requiring hospitalization for more than a day, nor were any of their injuries serious, permanent, or life-threatening. While this may be an arguably accurate characterization of the injuries suffered by the victims, the conclusion that can be drawn from the testimony is that the lack of serious injury to the victims does not result from any lack of effort on the part of appellant. Appellant and his brother and father repeatedly struck their victims with baseball bats and a metal pipe. No doubt countless instances can be shown in which a similar assault on defenseless victims has resulted in severe injury or death. The sentencing court found specifically that the harm caused by appellant's conduct was so great that no single prison term adequately addressed the seriousness of his crimes, which in conjunction with appellant's past history of juvenile offenses, including burglary and felonious assault, demonstrated the necessity of multiple prison terms to protect the public. The court's sentencing worksheet also sets forth factors reflecting the seriousness of appellant's offenses and the likelihood of recidivism. Furthermore, appellant's attitude during the course of trial and at sentencing, to the extent it can be ascertained from the transcript, evinces no assumption of responsibility, expression of remorse, or understanding of the seriousness of his crime. We therefore find no abuse of discretion on the part of the trial court in imposing consecutive sentences on appellant's multiple convictions. Appellant's second assignment of error is accordingly overruled.
In accordance with the foregoing, appellant's first and second assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.
BOWMAN, P.J., and BROWN, J., concur.